IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JENNIFER L. BUSBY,

      Plaintiff,

vs.                                  CASE NO. 1:13-cv-215-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

      Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for supplemental security income (SSI).  Doc. 1.  The Commissioner has answered, Doc. 10, and both parties have filed briefs outlining their respective positions.  Docs. 14, 15.  For the reasons discussed below, the undersigned recommends that the Commissioner's decision should be affirmed.

## I.  PROCEDURAL HISTORY

      Plaintiff applied for Supplemental Security Income on June 22, 2010, alleging disability since July 1, 2009.  She later amended her onset date to the date of her application.  (R. 28; 46.)   Her application was denied initially and upon reconsideration.  (R. 82-84; 89.)  At Plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on February 28, 2012.  At the hearing Plaintiff and a vocational expert (VE) testified.  (R. 46-67.)  The ALJ denied Plaintiff's claims in a decision dated June 15, 2012, finding that although Plaintiff suffered from the severe impairments of lumbar

back pain and migraine headaches, she was not disabled.  (R. 28-38.)  The Appeals

Council denied Plaintiff's request for review, rendering the ALJ's decision the

Commissioner's final decision.  (R. 1-4.)  On October 31, 2013, Plaintiff filed the instant

appeal to this Court.  Doc. 1.  On appeal, Plaintiff raises two issues: (1) whether

substantial evidence supports the ALJ's determination that Plaintiff has no severe

mental impairments, and (2) whether the ALJ erred by failing to give "great weight" to

Plaintiff's treating Advanced Registered Nurse Practitioner, Mary Ann Danker.  Doc. 14.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

taking into account evidence favorable as well as unfavorable to the decision.[4]

However, the district court will reverse the Commissioner's decision on plenary review if

the decision applies incorrect law, or if the decision fails to provide the district court with

sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment that can be

expected to result in death, or has lasted or can be expected to last for a continuous

period of not less than twelve months.[6]  The impairment must be severe, making

Plaintiff unable to do his previous work, or any other substantial gainful activity which

exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[8]  The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[9]  The Commissioner may satisfy this burden

---

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[9] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[11]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[13]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[14]  Only after the Commissioner meets this burden

Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[10] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[11] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] Walker, 826 F.2d at 1003.

[13] Wolfe, 86 F.3d at 1077-78.

[14] See id.

does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

### A. Medical Record Evidence

Because Plaintiff's appeal focuses on her alleged mental health impairments, and her treatment with Mary Ann Danker, RN,  the Court's summary of her medical records will focus on these issues.

Plaintiff was admitted to Baptist Medical Hospital in Alabama in January of 2011. She was brought to the Emergency Room by police and EMS because of delusional thinking and pressured speech after she was found wandering.  Her records disclose that she was a poor historian of her medical history and that her thoughts were disorganized.  She made odd comments and was paranoid.  She was diagnosed with undifferentiated schizophrenia and was given Haldol.  (R. 446-54; 506-528.)

Upon her return to Florida, Plaintiff was seen on April 21, 2011, by Ms. Danker for a psychological evaluation.  Ms. Danker's notes show that Plaintiff suffered from a history of drug abuse, and she had symptoms of extreme agitation.  Plaintiff reported feeling nervous and having trouble eating and sleeping, and having little energy.  Ms. Danker noted that Plaintiff had poor hygiene.  Plaintiff returned to Ms. Danker on May 19, 2011, and June 15, 2011, pursuant to her treatment plan.  Ms. Danker noted that Plaintiff suffered from PTSD due to her children being removed from her care. Treatment notes from those visits show that Haldol was discontinued because Plaintiff was improving.  She was also seen on August 29, 2011 by Ms. Danker, who noted that

Plaintiff was stable and doing well.  Ms. Danker discharged Plaintiff from her services because of her improvement.  (R. 483-504.)

On June 10, 2011, Ms. Danker filled out a residual functional capacity form. which included the following questions: whether Plaintiff would need to rest during an eight-hour workday, and how much weight Plaintiff could lift and carry.  (R. 456-57.) Ms. Danker also filled out a Mental Capacity assessment.  She opined that Plaintiff suffered from moderate limitations in the ability to remember locations and work-like procedures, the ability to understand and remember short and simple instructions, and to understand and remember detailed instructions.  She estimated that Plaintiff had moderate limitations in the ability to carry out very short and simple instructions, and marked limitations in the ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance, and the ability to sustain an ordinary routine without special supervision.  Ms. Danker concluded that Plaintiff had moderate difficulties in the ability to make simple work related decisions, but marked difficulties in the ability to work in coordination with or in proximity to others without being distracted by them, complete a normal workday without interruptions from psychologically based symptoms, and to perform at a consistent pace with a standard number and length of rest periods.  Ms. Danker also concluded that Plaintiff would likely have "4+" absences each month from work.  Ms. Danker opined that Plaintiff had moderate difficulties in the ability to ask simple questions or request assistance, and the ability to get along wit coworkers or peers without distracting them or exhibiting

behavioral extremes, and that Plaintiff suffered from marked limitations in the ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Finally, Ms. Danker opined that Plaintiff had moderate limitations in the ability to set realistic goals or make plans independently of others, and marked limitations in the ability to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and the ability to travel in unfamiliar places or use public transportation.  (R. 458-60.)

### B.  Hearing Testimony

At the hearing before the ALJ, Plaintiff testified about her back pain, which she said was on her lower right side.  She described it as a dull ache that would get very tight.  She stated that twisting, turning, standing, walking, and sitting up for a prolonged period of time, such as for more than a half an hour, would make the pain worse. Plaintiff testified that hot compresses, Icy Hot, and Tramadol eased her pain, but it just took the edge off and made the pain "bearable."  Plaintiff experienced dry mouth and tiredness from the Tramadol, but no other side effects.  Plaintiff estimated that she could stand for about an hour and a half or two hours before she needed to sit down, and could walk about a block before needing to rest.  (R. 46-50.)

Plaintiff also testified that she had pain when lifting and carrying, and pain while she lifted over her head, which was worse on her right side.  She did not have problems bending at the waist, stooping, or squatting.  She needed to lie down during the day for

at least an hour and a half due to the pain.  (R. 50-23.)

Plaintiff stated that she was able to do dishes, but struggled with the laundry because the laundry basket was quite heavy.  She was not able to sweep, mop, or dust, but was able to prepare meals.  She was able to watch TV, check her emails, and read during the day, but was not able to play video games.  She also had no problems bathing herself.  She typically drove her husband to work, and sometimes went to a friend's house.  She could also go grocery shopping with help.  (R. 53-55.)

Plaintiff testified that her migraines occurred every day, sometimes twice a day, and they lasted a couple of hours without medication.  With medication, they were down to  an hour or half an hour.  The migraines caused her to have light sensitivity, and she needed to lie down until the medication kicked in.  She also could not take the medication every day because it could cause a different type of migraine.  It also caused her to experience dry mouth.  If she could not use Imitrex, Plaintiff usually used a warm washcloth over her eyes.  (R. 55-57.)

Plaintiff also suffered from PTSD, and suffered nightmares related to losing her three children.  The Department of Children and Families removed her children in 2009 due to her home being an unfit environment because it was too dirty. Plaintiff's parental rights were terminated.  (R. 57-58.)

Plaintiff testified that although she abused drugs and alcohol as a teenager she was now clean.  She smoked about a pack of cigarettes a day. (R. 58.)  The ALJ noted that treatment records disclosed the provider was concerned that Plaintiff was preoccupied with obtaining narcotics for her back pain.  Plaintiff testified that she had

not had narcotics for about six months at that point.  (R. 60.)

Plaintiff received her GED from Gainesville Job Corps in 2001, and went to City College for about six months.  (R. 58-59.)

Upon questioning from the ALJ, Plaintiff stated that she saw Mary Danker at Meridian about once a month for counseling, but she was no longer taking any medication, and she had not taken any since May of 2011.  (R. 59-60.)

The ALJ also asked Plaintiff about the details of her hospital stay in Alabama, but she could not remember any specifics.  (R. 60-62.)

A vocational expert (VE) also testified at the hearing. The ALJ posed a hypothetical question to the VE, in which he asked the VE to assume an individual thirty-four years old, with a GED, with a good ability to read and write, and use numbers, with no past work history, and with the following restrictions: occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, can stand for six hours and sit for six hours in an eight-hour work day with normal breaks, and frequently perform all postural movements such as stooping, crouching, crawling, kneeling, balancing, and climbing stairs and ladders, but should avoid concentrated exposure to noise, vibration, and hazards such as machinery and heights.  There were no mental restrictions.  The VE testified that such an individual could perform work such as office helper.  Such an individual could also perform the sedentary jobs of addresser, and charge account clerk.  This was a representative list, not an exhaustive one.  (R. 62-65.)

### C. ALJ's Decision

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 22, 2010, the application date.  He determined that Plaintiff had the severe impairments of: lumbar back pain, and migraine headaches.  He further found that Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings.  (R. 30-32.)

The ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 CFR 416.967(b), except that she was limited to standing and/or walking or six hours in an eight-hour work day, and six hours sitting in an eight-hour work day. She was also limited to frequent climbing of ramps, stairs, ladders, ropes, and scaffolds, and frequent balancing, stooping, kneeling, crouching, and crawling.  She should avoid concentrated exposure to vibration, noise, and hazards such as heights and machinery.  In making this determination, the ALJ partially credited Plaintiff's complaints regarding the effects of her medically determinable impairments, but found that Plaintiff's complaints were not fully credible.  (R. 32-34.)

The ALJ found Plaintiff had no past relevant work, but she was a younger individual with a high school diploma.  The ALJ determined that considering her age, education, work experience, and RFC, there were jobs that existed in the national economy that she could perform, such as office helper, cashier, addresser, and charge account clerk.  Accordingly, the ALJ concluded that Plaintiff was not disabled.  (R. 34-38.)

# IV.  DISCUSSION

## A.    *The ALJ did not err in concluding that Plaintiff did not have a severe mental impairment*

Plaintiff contends that substantial evidence does not support the ALJ's finding that Plaintiff's undifferentiated schizophrenia and/or PTSD and anxiety are not severe impairments at Step Two and, accordingly, that the ALJ failed to consider Plaintiff's mental impairments in combination with her other severe impairments.  Doc. 14.

An impairment or combination of impairments is severe at Step Two of the sequential evaluation if it significantly limits one's physical or mental ability to do basic work activities.[15]  To be considered "severe" a medical condition must constitute more than a "deviation from purely medical standards of bodily perfection or normality."[16]  Thus, a diagnosis of a mental impairment does not necessarily compel the conclusion that the condition is disabling.[17]  Although the threshold for meeting the definition of a "severe impairment" at Step Two is low, the burden is, nonetheless, on Plaintiff to provide evidence demonstrating the disabling impact of the mental impairments.[18]  The ALJ is required to evaluate Plaintiff's mental impairments in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and

---

[15] 20 C.F.R. § 404.1520(c).

[16] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[17] 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[t]here must be a showing of related functional loss" for a psychological disorder to be considered disabling).

[18] Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

episodes of decompensation.[19]  If the degree of limitation in the first three functional

areas is rated as "none" or "mild" and "none" in the fourth area, the ALJ generally

concludes the mental impairment is not severe.[20]

In this case the ALJ specifically found that the medical evidence failed to show

any severe mental impairment.  (R. 31.)  The ALJ considered the four broad functional

areas, and found that Plaintiff had only mild restrictions in her activities of daily living,

mild difficulties in maintaining social functioning, no difficulties in maintaining

concentration, persistence, or pace, and no episodes of decompensation of extended

duration.  In reaching this conclusion the ALJ highlighted that the Plaintiff had denied

depression and anxiety to Dr. Whittaker, her primary care physician, and that she had

been discharged from services by Ms. Danker because she was "stable" and doing well.

(R. 32.)

Plaintiff makes no persuasive argument to the contrary. Plaintiff contends that

the ALJ erred because he did not discuss Plaintiff's one-time diagnoses of

schizophrenia.  As the Commissioner points out, this diagnosis was not corroborated by

Dr. Whittaker or Ms. Danker, who actually treated Plaintiff.  Simply because there is a

diagnosis in the record, without any further evidence, does not make an impairment

severe.  Furthermore, Plaintiff's prescription for Haldol was discontinued, thus

evidencing that Plaintiff's mental health improved..

---

[19] 20 C.F.R. § 404.1520a(c)(3).

[20] 20 C.F.R. § 404.1520a(d)(1). *See also* <u>Cuthbert v. Astrue</u>, 303 F. App'x 697, 699 (11th Cir. 2008) (per curiam).

Plaintiff also points to the mental RFC, prepared by Ms. Danker as evidence that she had a severe mental impairment.  The ALJ noted that the questionnaire was provided by Plaintiff's counsel. While this would not be a reason standing alone to discount Ms. Danker's opinion, the ALJ discussed other substantial evidence in the record to support his decision to give Ms. Danker's opinion  "little weight or consideration." Of primary importance in discounting the opinion of Ms. Danker, the ALJ pointed out that Ms. Danker–who is a nurse practitioner and not a treating medical doctor–is not considered an acceptable medical source. Acceptable medical sources include licensed physicians and licensed or certified psychologists.[21] Healthcare personnel–such as nurse practitioners– who are not considered to be acceptable medical sources cannot give medical opinions and their conclusions cannot receive controlling weight.[22]  Rather, Mr. Danker's opinion is afforded weight only to the extent that it is supported by the treatment provided, the extent of examinations and testing performed, the consistency with the other evidence and the degree of explanation provided with the opinion.[23] the ALJ noted that although Ms. Danker treated Plaintiff only for her mental health concerns, she also filled out a questionnaire about Plaintiff's physical state.  The ALJ found that Ms. Danker's answers to the mental RFC questionnaire were not consistent with her own treatment notes, which showed that

---

[21] 20 C.F.R. § 416.913(a)(1)-(2).

[22] *See* SSR 06-03p, 2006 WL 2329939, at *2; *see also* 20 C.F.R. § 416.927(a)(2)(limiting medical opinions to statements from acceptable medical sources).

[23] SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

Plaintiff was doing well enough to be discharged from treatment.

Further, while Ms. Danker only provided counseling for Plaintiff's mental health issues, Ms. Danker also completed a questionnaire regarding Plaintiff's physical limitations even though Ms. Danker did not provide any treatment for Plaintiff's physical impairments.

In discounting Ms. Danker's opinions, the ALJ also relied upon the fact that the opinions in the mental RFC were inconsistent with Ms. Danker's own notes. For example, Ms. Danker discharged Plaintiff from treatment after only four sessions noting that Plaintiff was "stable," "doing well," and had made a 9 out of 10 in terms of progress. Moreover, Ms. Danker's treatment notes reflect that Plaintiff's mental status examinations were largely benign and noted that Plaintiff had grossly intact cognition, appropriate mood and affect, coherent thought process, and good judgment and insight. The ALJ's reliance upon Ms. Danker's own progress notes, rather than the conclusory forms, in discounting Ms. Danker's opinions was supported by substantial evidence and was wholly consistent with the fact that Ms. Danker is not an acceptable medical source. Accordingly, the ALJ did not err in discounting Ms. Danker's conclusions contained in the form she completed.

Lastly, a review of the written decision evidences that the ALJ fully considered all of Plaintiff's impairments (including her mental impairments) whether severe or not in formulating Plaintiff's RFC.

Plaintiff's conclusional assertion that the ALJ erred is insufficient to carry the relatively low burden of establishing the existence of a severe mental impairment.  The

ALJ considered and discussed the relevant evidence in determining that Plaintiff did not have a severe mental impairment, and the ALJ's conclusion that Plaintiff's mental impairment was not severe is supported by substantial evidence, as summarized above.

**B.    *The ALJ did not err by failing to give Ms. Danker's opinion great weight.***

Plaintiff argues that the ALJ erred by failing to give "great weight" to the opinion of Mary Ann Danker, Plaintiff's treating nurse practitioner.  Plaintiff argues that although Ms. Danker is not an acceptable medical source pursuant to 20 CFR § 404.1513(a), she is an "other medical source," pursuant to 20 CFR § 404.1513(d)(1) and a medical source pursuant to 20 CFR § 404.1502.

As discussed above, a nurse practitioner is not an "acceptable medical source" under the Commissioner's Regulations, *see* 20 C.F.R. §§ 404.1513(a) and SSR 06–03p, and thus the checklist completed by Ms. Danker has limited value.  *See, e.g., Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (report of chiropractor, a non-acceptable medical source, cannot establish impairment).  Although Ms. Danker is considered an "other medical source" pursuant to 20 CFR § 404.1513(d)(1),  Ms. Danker's checklist would only be afforded weight to the extent that it was supported by the factors listed in 20 C.F.R. §§ 404.1527(c), and was consistent with the evidence of record.

The ALJ specifically discussed Plaintiff's treatment records with Ms. Danker and explained in detail why he gave it her opinion "little weight or consideration."  A review of Plaintiff's Meridian records reflects that Ms. Danker's checklist assessment, finding

moderate and marked limitations in several functional areas, is at odds with Plaintiff's treatment notes.

Plaintiff presented at Meridian for counseling and medication management on only four occasions in 2011.  (R. 482-504.)   At these visits, Ms. Danker's mental status examination findings showed rapid improvement, and that Plaintiff was doing well and was stable, to the extent that Ms. Danker discharged her from treatment and discontinued medications.  Ms. Danker's checklist provides no explanation for her assessment of moderate and marked limitations in the face of such limited – and positive – treatment evidence.  Furthermore, as the ALJ noted, there is no explanation how Ms. Danker came to her conclusions about Plaintiff's physical limitations, even though Ms. Danker only treated Plaintiff for her mental health concerns.  *See* R. 455-460.  The assessment is not based on any longitudinal record of Plaintiff's condition because Ms. Danker saw Plaintiff only four times, within the span of a few months in 2011, with the final occasion, in August of 2011, which was about two months *after* the completion of the checklist form provided by Plaintiff's disability counsel. As such, the checklist does not reflect the improvement demonstrated in Ms. Danker's treatment notes.

Given that the ALJ had the benefit of the relevant treatment notes, that Ms. Danker is not an acceptable medical source and that Ms. Danker's checklist assessment is wholly inconsistent with her progress notes, which documented Plaintiff's limited treatment, the ALJ did not err by giving Ms. Danker's opinion  "little weight or consideration."

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner should be **AFFIRMED**.

**IN CHAMBERS,** in Gainesville, Florida, on the 26th day of November 2014.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**